# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CHARLIE J. BARBER, II,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:16-cv-00848-MHH** |
| | } | |
| **CELLCO PARTNERSHIP d/b/a** | } | |
| **VERIZON WIRELESS,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

*Pro se* plaintiff Charlie Barber is a former employee of defendant Cellco Partnerhsip d/b/a Verizon Wireless.  Mr. Barber contends that Verizon violated the Americans with Disabilities Act, i.e., the ADA, by failing to promote him because of his disability.   Mr. Barber also asserts state law claims against Verizon for intentional infliction of emotional distress and outrage.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Mr. Barber asks the Court to enter judgment as a matter law on Verizon's affirmative defenses. (Doc. 47).   Pursuant to Rule 56, Verizon asks the Court to enter judgment as a matter of law in its favor on all of Mr. Barber's claims against the company.  (Doc. 65).

For the reasons explained below, the Court grants Verizon's motion for summary judgment on Mr. Baber's ADA claim and declines to exercise supplemental jurisdiction over Mr. Baber's state law claims for intentional infliction of emotional distress and outrage.

## I.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  "In practice, cross motions for summary judgment may be probative of the nonexistence of a factual

dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Georgia State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (internal quotation marks and brackets omitted) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)). "If both parties proceed on the same legal theory and rely on the same material facts," then " the case is ripe for summary judgment." *Georgia State Conference of NAACP*, 775 F.3d at 1345 (internal quotation marks omitted) (quoting *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983)).

## II.    FACTUAL BACKGROUND

Because the Court resolves this matter on the basis of Mr. Barber's ADA claim, the Court presents the evidence in the light most favorable to Mr. Barber. The evidence demonstrates that Verizon hired Mr. Barber in 2005 as a coordinator of customer technical support. (Doc. 67-1, p. 49). On August 1, 2007, Verizon promoted Mr. Barber to a "Member—Technical Staff" position at Verizon's call center in Huntsville, Alabama. (Doc. 67-1, p. 50; Doc. 67-6, ¶ 5). On November 25, 2012, Mr. Barber's job title changed to Member Technical Support I or MTS I—End User Support. (Doc. 67-1, p. 50; Doc. 67-4, p. 8). Mr. Barber reported to IT Manager Todd Schumacher, and Mr. Schumacher reported to Mike Dohar, Associate Director—End User Support. (Doc. 67-7, ¶ 3).

Mr. Barber's job responsibilities did not change when his job title changed. (Doc. 67-1, p. 51). In his role as MTS I—End User Support, Mr. Barber was responsible for providing technical support services to call center employees. These services included installing servers, computers, computer components, and telephones; transferring equipment to varying offices; and troubleshooting devices. (Doc. 67-1, pp. 51-52). Installing servers involved "putting [the server] in a location where it needs to go, plugging it in and wiring it up." (Doc. 67-1, p. 51). Mr. Barber also replaced computers and monitors and removed cords from telephones. This work required him to lift, bend, and stoop. (Doc. 67-1, p. 51). As part of his MTS I—End User Support position, Mr. Barber also participated in optional new hire orientation sessions for call center employees. (Doc. 67-1, pp. 51-52).

Mr. Barber also was responsible for assisting "front-facing" or internal call center employees who handle service calls from Verizon customers. (Doc. 67-1, p. 52). If a call center employee encountered a technical problem, the employee could seek assistance by sending a "trouble ticket" to End User Support. (Doc. 67-1, p. 52). Mr. Barber and other MTS I employees reviewed the tickets to identify the problem and determine whether to resolve the issue from the MTS I employee's desk or whether the problem required face-to-face contact. (Doc. 67-1, p. 52). Mr. Barber spent the majority of his time providing face-to-face assistance

to call center employees, and Verizon managers encouraged face-to-face support. (Doc. 67-1, pp. 52-53).

In August 2013, Mr. Barber injured his back while lifting a server at work. (Doc. 67-1, pp. 7, 12). One day later, he told Mr. Schumacher about the injury and told Mr. Schumacher that his "back was aching." (Doc. 67-1, pp. 12-13). Mr. Schumacher indicated that he would investigate how Mr. Barber could get workers' compensation for the injury. (Doc. 67-1, p. 14). Verizon's Code of Conduct states that the company must "record and report work-related accidents." (Doc. 78-8, p. 13). The Code of Conduct explains:

> If you are involved in a work-related accident, you must immediately report it to a supervisor and follow the company's policies for reporting accidents and injuries. The supervisor must contact the Incident Reporting Center at 866.899.2524 or online by using the Enterprise Safety System, (ESS) (About You>Shortcut>ESS) to report workplace accidents and injuries.

(Doc. 78-8, p. 13).

Mr. Barber did not complete an incident report concerning his back injury. (Doc. 67-1, p. 14). Mr. Barber contends that Mr. Schumacher was supposed to "get the incident paperwork," but Mr. Schumacher did not give the paperwork to Mr. Barber. (Doc. 67-1, p. 14). Mr. Schumacher denies that Mr. Barber immediately reported that he had injured his back at work. Mr. Schumacher contends that Mr. Barber did not report his back injury until December 2014. (Doc. 67-7, ¶ 4).

An undated audio recording captures a conversation in which Mr. Barber told Mr. Schumacher about his plans to file a disability claim through MetLife. Mr. Barber stated that he "might do workman's comp" as a result of his injury. (Doc. 78-6, at 14:48-14:50). Mr. Schumacher responded that if Mr. Barber planned to pursue workers' compensation, then he (Mr. Schumacher) must know about it, and that "at the time the incident was not reported as workers' comp." (Doc. 78-6, at 15:19-15:22). Mr. Schumacher explained to Mr. Barber that "workers' comp is up to you, I cannot say you cannot file a workers' comp claim, it's up to you." (Doc. 78-6, at 16:09-16:13).

Mr. Barber went to the doctor within a week of the August 2013 injury. (Doc. 67-1, p. 12). Mr. Barber's doctors treated his back pain with medication, epidurals, and physical therapy. (Doc. 67-1, p. 13). According to Mr. Barber, his injury impacted his ability to do his job because he had trouble bending, stooping, and lifting, and he could not replace computers or cords under tables. (Doc. 67-1, p. 46).

At some point, Mr. Barber called Verizon's employee complaint hotline and explained that he "had an incident at work and that [he] was not in a good mood and that [he] need[ed] to see a psychologist. . . [a]nd seek medical attention." (Doc. 67-1, p. 20). Mr. Barber did not tell the hotline representative what type of medical attention he needed. (Doc. 67-1, p. 21). Mr. Barber also did not tell the

hotline representative that he had been injured at work or that he believed he was entitled to worker's compensation. (Doc. 67-1, p. 39).

On a number of occasions between August 2013 and April 2014, Mr. Barber emailed Mr. Schumacher after 9:30 a.m. -- Mr. Barber's scheduled start time -- to let Mr. Schumacher know that he would be late for work. (Doc. 67-4, pp. 34-42).[1]

In September 2013, Mr. Schumacher documented a counseling discussion with Mr. Barber after which Verizon placed Mr. Barber on a performance improvement plan until December 9, 2013. (Doc. 67-7, p. 15). The counseling note states:

> Charles has shown a trend of not coming to work on time as scheduled. Often times as his manager I have to remind him to make sure that he contacts me if he is going to be late or out for the day. Without him in the office as scheduled it adds more work to his team members. He does a good job with his day to day functions related to his job responsibilities but need him to focus on ensuring that he is at work as scheduled. Charles's current hours are 9:30am-6:30pm.

---

[1] On August 7, 2013, Mr. Barber emailed Mr. Schumacher at 10:37 a.m. stating, "[h]ey, I'll be in around 12 or 1. Is that cool?" (Doc. 67-4, p. 34). On August 15, 2013, Mr. Barber emailed at 11:22 a.m. and said, "[h]ey, I'm putting in for the day off. I'm going to check on one of my Mentees who I forgot has surgery this morning." (Doc. 67-4, p. 35). On September 12, 2013, Mr. Barber emailed at 9:46 a.m. and told Mr. Schumacher, "[b]e there about 930a." (Doc. 67-4, p. 36). On September 30, 2013, at 9:55 a.m., Mr. Barber emailed and said, "[b]e there around 9:30." (Doc. 67-4, p. 37). On October 2, 2013, Mr. Barber emailed Mr. Schumacher at 10:47 a.m. stating, "Gm sir, Have to run by the Doctor's real quick. Be there I guess in 2 hours. I will just use 2 hours of Vacation." (Doc. 67-4, p. 38). On January 23, 2014, at 10:13 a.m., Mr. Barber emailed and said, "[h]ey I'm on my way in, just moving a little slow. Will be in momentarily." (Doc. 67-4, p. 39). On March 17, 2014, Mr. Barber emailed at 9:47 a.m., "Hey, I'm going to get my license plate renewed, so I'll be in after that." (Doc. 67-4, p. 40). On April 7, 2014, Mr. Barber emailed at 10:50 a.m., "I'm moving a little slow this morning, but I'm coming in." (Doc. 67-4, p. 41). On April 17, 2014, Mr. Barber emailed Mr. Schumacher at 10:18 a.m., "I'll be in around 1 pm sir." (Doc. 67-4, p. 42).

> Mon-Fri. Example of this occurred today September 10, 2013. Charles did not arrive onsite until 10:10am CST when he is suppose[d] to be here at 9:30 am. Nor did he contact me to let me know that he may be late. He has expressed to me that he is having back issues with a past ailment that sometimes causes him to be in pain and not make it in on time. I have suggested to Charles on several occasions that he needs to look at submit[ing] for FMLA due to this issue.

(Doc. 67-7, p. 15).

In late 2013, Mr. Barber led a team of IT employees responsible for installing a server, removing old telephones, and replacing new telephones. (Doc. 67-1, pp. 44-45; Doc. 67-7, ¶ 8). The project was known as the IPACD roll-out. (Doc. 67-7, ¶ 8). At the end of the project, Mr. Barber's team did not remove some of the old telephones and cords. (Doc. 67-1, pp. 63-64). Mr. Schumacher and another employee removed the remaining phones and cords. (Doc. 67-7, ¶ 8). Mr. Barber testified that his team was unable to remove all of the old phones and cords because he lacked "manpower" and "resources." (Doc. 67-1, p. 64). Mr. Barber also testified that as the lead on the project, if he "assigned somebody a task and they don't accomplish it, . . . it falls back on the lead." (Doc. 67-1, p. 64).

On December 19, 2013, Marcia Belford, Associate Director—Technical Customer Service, emailed Mr. Schumacher regarding an interaction with Mr. Barber that occurred on December 18, 2013:

> Below is the recap of my conversation with Charles on 12/18.
>
> I had my admin open a ticket for my laptop on Monday the 16th due to it being damaged on my trip home from Charlotte. The power insert

was damaged but myself and another ad managed to insert the power cord to get some power to the laptop.

I saw Charles out on the floor and asked if he could take a look at my laptop. He stated "I am busy right now Marcia" I said to him, that I understood that but was wondering if he could get me a loaner etc as I was going to be out of the office next week. He acted angry towards me. I was not aware at that time that Kimshara had a conversation with him that morning about the laptop and the conversation got somewhat heated. She told me after the fact that she was upset with him and thought he treated her unprofessionally.

I said to him that I needed even a loaner due to work I had to complete while out of the office. He stated to me "your [sic] not listening to me" I am busy and not sure when I will get to it and will not guarantee you a loaner by the end of the week. I asked if by chance my old laptop might be an option. He stated in an angry voice "Marcia, you are not listening to me" I am busy and will not get to it today. I th[e]n stated that I felt he was being disrespectful to me as I would not talk to him the way he is speaking to me. He stated again in an angry tone "You're not listening to me I told you I would not guarantee you a laptop by Friday".

He then walked away and said something to Kathleen (one of my reps) about me. I verified after when talking to her that she felt he was not professional and should not have said anything to her. She did not tell me what he said.

I felt his approach, body language and tone was totally unprofessional.

He came to my office about 6pm last evening with a loaner. I was with a supervisor and he said to me, you wanted a laptop, right, well here it is, where do you want it? His tone was abrupt and my sup said, wow. I stated yes thank you, he put it on the desk and said well you won't have a docking station but here it is.

(Doc. 67-1, p. 59; Doc. 67-4, p. 48).

Mr. Barber denies much of Ms. Belford's account of their interaction. (*See* Doc. 67-1, p. 61). According to Mr. Barber, Ms. Belford "got hostile and yelled at [him] on the floor in front of people." (Doc. 67-1, p. 60). Mr. Barber testified that Mr. Schumacher told him "don't worry about Marcia." (Doc. 67-1, p. 62). Before Ms. Belford asked Mr. Barber about a new laptop, she had emailed Mr. Schumacher requesting a replacement. (Doc. 78-7, p. 4). Mr. Schumacher emailed Mr. Barber and another IT staff member and instructed them "not to give her anything until we get our broken one back. . . . Once we get it back give her a new one." (Doc. 78-7, p.4). Three days after their encounter, Ms. Belford emailed Mr. Barber, and she copied Mr. Schumacher. (Doc. 78-7, p. 6). The email states, "I wanted to thank you for your help with my laptop on Wed. I know how hectic it was so I appreciate you coming over with a loaner in the afternoon." (Doc. 78-7, p. 6).

On April 21, 2014, Mr. Dohar and Mr. Schumacher received a copy of Verizon's Job Evaluation Review Process for IT career progression and the deadlines for submission of candidates to promote to the next level, MTS II-End User Support. (Doc. 67-7, ¶ 13; Doc. 67-7, pp. 30-34). The process allows supervisors to nominate employees to advance to the next level in the IT career track. (Doc. 67-7, ¶ 13). According to the schedule for promotions, supervisors were to recommend employees for promotion by May 16, 2014. (Doc. 67-7, p.

34). Verizon would review and approve the promotions before communicating decisions to employees by July 3, 2014. (Doc. 67-7, p. 34). Approved promotions would take effect on July 6, 2014. (Doc. 67-7, p. 34).

On April 29, 2014, Samantha Miller, Verizon's Global Enterprise Advisor-Business/Government Customer Operations, emailed Mr. Schumacher regarding an interaction she had with Mr. Barber. (Doc. 67-7, p. 36). Ms. Miller's email reads:

> This email is in regards to a few experiences I've had with Charles Barber. I recently spoke to Charles on the floor and stated 'I have a quick question for you'. I was told 'There were no quick questions' and he walked away. Normally, this wouldn't be an issue however within the next 5 minutes he willingly helped anyone else who had a 'quick question' and still pr[o]ceded to ignore me. On the next occasion, I opened an ITSC ticket due to password reset issues. Upon Charles arriving, his approach to me was very abrupt. I stated to Charles that I would prefer that we had a non aggressive relationship, however, that is not the case. To be fair, he did later apologize for the password reset interaction. Last week he blatantly ignored me and my entire team, including my supervisor, when we were asking him a direct question. He just walked away leaving everyone confused about his behavior. My interactions with Charles have been very hostile and argumentative. I appreciate your time with this matter and I just wanted to bring it to your attention.

(Doc. 67-7, p. 36).

On May 14, 2014, Mr. Schumacher recommended two MTS I employees for promotion pursuant to Verizon's Job Evaluation Review Process: Adonis Hart and Jay Sadler. Mr. Schumacher did not recommend Mr. Barber for promotion

because Mr. Schumacher was concerned about Mr. Barber's "performance and behavioral issues" including "unprofessional exchanges with supervisors and internal customers, frequent tardiness and lack of advance notice, [and] failure to empty his voice mailbox." (Doc. 67-7, ¶ 17).

Beginning on May 21, 2014, Mr. Barber took short term disability leave. He returned to work on August 4, 2014. (Doc. 67-2, p. 10; Doc. 78-2, p. 5). When he returned from leave, Mr. Barber learned that Verizon had promoted Mr. Hart and Mr. Sadler from MTS I to MTS II positions. (Doc. 67-2, p. 10).

On September 2, 2014, Mr. Barber emailed Mr. Dohar and asked about Verizon's new promotion process. Mr. Barber's email reads:

> Good Afternoon,
>
> In the conversation with you, Todd, and I, he stated that there was a new promotion process? Can you fill me in on the new process? He never did stated why I didn't get promoted while I was out. Or is it like you stated because I was out on Short Term?
>
> Thanks.

(Doc. 78-3, p. 3).

Mr. Dohar responded to Mr. Barber via email. Mr. Dohar's email states:

> There are a few things a team member needs to be promoted:
>
> 1.  Performance of the current job needs to be exceptionally well.
> 2.  The person has demonstrated being capable of handling the additional responsibilities of the next level.

3.  Management approval.  This doesn't necessarily always mean Todd or I but all the way up the approval process.  Promotions, like our STI, are never guaranteed.

On the last promotions that went through, Todd felt you weren't ready yet.  It is up to you to prove to Todd that you are ready.  That is why I requested weekly meetings.  He needs to communicate what you do well and what areas of opportunity you have.  If you do everything to his expectations for the next level, then you can become promotable.  Attitude is also key.  Stay positive and work with him.  Come to me if you feel you are doing everything right and he isn't giving you a fair shot.

(Doc. 78-3, p. 2).

Mr. Barber then emailed Mr. Dohar and stated, "You also stated per our phone convo that promotions stop when we're out as well and that was part of the reason for me not being considered.  Is that correct?"  (Doc. 78-3, p. 2).  Mr. Dohar sent an email to Mr. Barber in response to his question.  Mr. Dohar explained:

Charles, although this had nothing to do with you being promoted, when someone is out on leave they are frozen in the system.  We cannot make any changes until they return from work.  This also freezes things like STI so if you were out for 1 month, you would only be eligible for 11 months of STI.

(Doc. 78-3, p. 2).

On September 22, 2014, at 9:50 a.m., Mr. Barber emailed Mr. Schumacher and asked, "Is it ok, if I work from home for 2 hours, until my back starts feeling a little better?"  (Doc. 67-2, p. 12; Doc. 67-5, p. 26).  Mr. Schumacher granted the request and asked Mr. Barber to please call him before being late to work, so that

he (Mr. Schumacher) could notify other team members regarding changes to Mr. Barber's schedule. (Doc. 67-7, ¶ 20). Mr. Schumacher also told Mr. Barber that he (Mr. Barber) would need to formalize his request for a work accommodation by submitting a workplace arrangement or WPA form. (Doc. 67-1, pp. 29-30, 55; Doc. 67-7, ¶ 20).

On October 17, 2014, Mr. Schumacher sent an email to Mr. Barber. The subject line is "Alternate work request," and the email states:

> I wanted to follow back up with you in regards to our meeting. Here is the action items that need to be completed:
>
> - I show that the FML Claim FM1405144069 that has a certified start date of 9/23/2014 ended on 10/4/2014. You will need to contact MetLife on this claim to see why it has ended.
>
> - For the Alternate Work Request you will need to have your doctor complete the attached (WPA) form and send it back to me to send up to HR for review.
>
> Please let me know if you have any questions regarding this.

(Doc. 67-5, p. 27).

On October 26, 2014, Mr. Barber submitted an on-line application for an Alternative Work Arrangement or AWA in which he requested that Verizon allow him to telecommute full-time. (Doc. 67-1, p. 57; Doc. 67-4, p. 32). Mr. Schumacher discussed the request with Mr. Dohar and Mr. Vader. The three decided that Mr. Barber's job duties required that he be onsite at the call center.

(Doc. 67-7, ¶ 22).  Mr. Schumacher told Mr. Barber that he must work onsite, and Mr. Schumacher also advised Mr. Barber that the AWA was not the proper form to request a medical accommodation.  (Doc. 67-7, ¶ 22).  Instead, Mr. Schumacher told Mr. Barber that he needed to complete a WPA form.  (Doc. 67-7, ¶ 22).  Mr. Schumacher reminded Mr. Barber to complete the WPA and to have his doctor complete the relevant sections of the form.  (Doc. 67-2, p. 15; Doc. 67-7, ¶ 22).

On October 31, 2014, Mr. Schumacher emailed Mr. Barber.  The subject line is "For our meeting," and the email states:

Updates for our meeting:

- Charles continues to improve upon being a leader of the Huntsville FYS team.  Examples of this have been assisting our new contractor with complex issues that he needs assistance with.

- Charles recently completed a CCNA bootcamp (completed on Friday 10/24).  Need to work on getting certified by 11/30/2014.

- WPA – Charles submitted for an[] adjusted work schedule due to back issues which was covered under STD.  During past one on ones I explained to Charles that he needs to provide documentation from his Doctor to me on what he recommends from a WPA. I have not received this paperwork from Charles.

- At this time Charles does not have any open FML or STD cases.  Any time missed due to his medical condition will need to be used as vacation/personal time.  I have explained to him to contact MetLife and see what is going on with his case.

Overall I have seen great improvement from Charles over the past couple of months.  Key item for him to follow up with is the WPA request documentation as well as contacting MetLife.

(Doc. 78-9, p. 6).

On November 17, 2014, Mr. Barber emailed Mr. Schumacher.  The email states:  "I have the paperwork you requested from my Doctor in reference to my condition and my limitations.  I placed it on your desk.  I'm still waiting for my Doctor to complete the Workplace Arrangements form and I will get that to you as well."  (Doc. 78-9, p. 6).

The paperwork that Mr. Barber provided was a progress note from a June 16, 2014 visit with his doctor.  (Doc. 67-7, ¶ 23; Doc. 67-7, p. 44; *see* Doc. 78-9, p. 6).  The progress note indicates that Mr. Barber had lumbar radiculopathy.  (Doc. 67-7, p. 44).  Mr. Barber's doctor stated that Mr. Barber should "avoid bending over and avoid lifting more than 5 lbs to prevent complications in low back area. . . ."  (Doc. 67-7, p. 44).  Mr. Schumacher gave the progress note to Mr. Vader, and Mr. Vader sent to Mr. Schumacher another WPA form for Mr. Barber to complete.  (Doc. 67-7, ¶ 24).

On November 18, 2014, Verizon denied Mr. Barber's request to telecommute full-time.  (Doc. 67-5, p. 32).  Mr. Schumacher explained to Mr. Barber via email that:

> [t]he paperwork that you provided states to "avoid bending over and avoid lifting more than 5 lbs.["] We can make sure that any project etc that has a weight associated with it in excess of 5 or more pounds will not be assigned to you. We can discuss further. At this time the request for working from home is not an option with current paperwork provided.

(Doc. 67-5, p. 32).

On December 8, 2014, Mr. Barber informed Mr. Schumacher that he was working from home and would be in around noon. (Doc. 67-7, ¶ 25). On December 9, 2014, in an effort to accommodate Mr. Barber's back issues, Mr. Schumacher ordered Mr. Barber a foot stool and lumbar cushion. (Doc. 67-2, p. 15; Doc. 67-7, ¶ 26). On December 17, 2014, Mr. Barber emailed Mr. Schumacher and told him that he was having an issue with pain management and was running late. Mr. Barber had not returned an updated WPA form. (Doc. 67-7, ¶ 27).

On December 18, 2014, Mr. Barber emailed Mr. Schumacher and asked about the time frame for Verizon promotions. Mr. Barber copied Mr. Dohar on the email. Mr. Barber's email states:

> Good Evening,
>
> What was the promotion time-frame for this year and what are the promotion time-frames for next year?
>
> Wanted to know, so that I can set my sights for those time-frames and be on schedule with my certifications and other training for the promotion processes.

(Doc. 78-3, p. 8).

Mr. Schumacher responded to Mr. Barber via email and explained:

From what I gathered with the flow from this year is that promotions are looked at twice a year. Once around the April and September timeframes (but don't quote me on the timeframes). One key item for you is that part of our agreement for you taking the CCNA bootcamp a couple of months ago was for you to take the certification test. As of today you have not done so. So my ask to you is when will you be completing the testing phase?

(Doc. 78-3, p. 7).

Mr. Barber responded and asked:

Who can confirm the definite months and timeframes, so we'll know when those times are approaching, so that we can be educated and submitted for promotions?

I was not evaluated for September time-frame and that was before I even went to the boot camp. I was not notified when neither timeframes occurred.

I informed you of the testing and of purchasing a voucher, which was not provided with the course.

(Doc. 78-3, p. 7).

Mr. Dohar then responded:

Gentlemen, Let's not focus on timeframes because they may change every year. Charles, we should be setting expectations and reviewing performance weekly from our conversations earlier in the year and we should be providing feedback and goals to get you to the next level. Let me know if you feel this is not being done and we can discuss.

(Doc. 78-3, p. 7). Mr. Schumacher replied to Mr. Dohar's email and stated:

I have been meeting with Charles and providing feedback to him. I have been assigning Charles projects to give him some workload etc. Based on our meetings and what I have observed he is doing the right

things.  Charles, we will continue to meet and will ensure that you are on track for your goals.

(Doc. 78-3, p. 7).


On December 31, 2014, Mr. Barber emailed Mr. Schumacher and asked:

Question in reference to the question I asked on Dec. 13th, in reference to me getting approved for Workers Comp.  I haven't heard anything back from HR or anyone in regards to getting this approved, since I'm going to be out for Surgery on January 15th.  Can you provide me with an update or an appropriate direction in which to take?


(Doc. 67-7, p. 12).  Mr. Schumacher responded on January 2, 2015.  Mr. Schumacher's email reads:

Here is what we need.  We need to sit down on Monday when I return and complete the incident report.  This report outlines [the] timeframe it occurred etc.  If you have Dr. notes right after this instance stating that your back was injured at work etc I will also need that.

(Doc. 67-7, p. 12).  Mr. Schumacher states that Mr. Barber did not provide documentation from a doctor stating that he (Mr. Barber) had injured himself at work.  (Doc. 67-7, ¶ 5).  Mr. Barber has not provided evidence to contradict Mr. Schumacher's assertion.

On January 15, 2015, Mr. Barber took a leave of absence and applied for Short Term Disability and FMLA leave.  (Doc. 67-5, pp. 33-34; Doc. 67-6, ¶ 12).  MetLife denied Mr. Barber's claim for Short Term Disability leave.  (Doc. 67-6, p. 17).  Verizon approved Mr. Barber's FMLA claim, and according to Verizon, Mr.

Barber exhausted his FMLA leave on January 23, 2015. (Doc. 67-6, ¶ 12. Still, Mr. Barber continued his leave. (Doc. 67-6, ¶ 12). On February 23, 2015, Verizon sent Mr. Barber a return to work letter and requested that Mr. Barber return to work on March 2, 2015 and provide documentation demonstrating his need for a continued absence. (Doc. 67-6, ¶ 12). Verizon also gave Mr. Barber another WPA form to complete. (Doc. 67-6, ¶ 12).

On March 2, 2015, Mr. Barber submitted a WPA form that he and his physician completed. The WPA was dated December 2 and 5, 2014. (Doc. 67-2, p. 17; Doc. 67-6, ¶; Doc. 67-6, pp. 23-25). On March 4, 2015, a human resources representative advised Mr. Barber that he had not provided enough information to excuse his absences from work in January and February 2015 because the WPA form was dated before these absences. (Doc. 67-6, ¶ 13).

Mr. Barber returned to work on March 10, 2015. (Doc. 78-9, p. 5). On March 13, 2015, Mr. Barber submitted a new WPA. (Doc. 67-6, ¶ 14; Doc. 67-6, pp. 28-30). In the WPA, Mr. Barber's doctor noted that his medical condition was "temporary" and does not substantially limit a major life activity. (Doc. 67-6, p. 29). Mr. Barber's doctor stated that Mr. Barber should "be careful" with lifting, twisting motions, and bending. (Doc. 67-6, p. 29). The WPA form stated that if Mr. Barber's back hurt, then he should sit periodically and avoid "heavy lifting."

(Doc. 67-6, p. 29). Mr. Barber's doctor released him to work on March 6, 2015 with no additional restrictions. (Doc. 67-6, p. 30).

In his March 13, 2015 WPA, Mr. Barber included a request to "occasionally work from home remotely." (Doc. 67-6, p. 28). Because Mr. Barber's doctor's portion of the WPA form did not address Mr. Barber's request to work from home, Verizon followed-up with Mr. Barber's doctor. (Doc. 67-6, ¶ 15). Mr. Barber's doctor responded: "[A]s per previous note, Mr. Barber needs to refrain from heavy lifting, twisting, or excessive bending. If his back is hurting being able to sit periodically would help." (Doc. 67-6, p. 32).

Based on the March 13, 2015 WPA, Verizon approved the following accommodations for Mr. Barber: (1) excused Mr. Barber's time out of work from January 26, 2015 through March 6, 2015; (2) permitted Mr. Barber to avoid lifting more than 5 pounds, twisting, or excessive bending; and (3) permitted Mr. Barber to sit periodically if his back was hurting. (Doc. 67-6, ¶ 16; Doc. 78-9, pp. 2-4). Verizon denied Mr. Barber's request to work from home because his doctor's report did not support the request. (Doc. 67-6, ¶ 16; Doc. 78-9, pp. 2-4).

On April 20, 2015, Mr. Barber emailed Mr. Dohar with questions about the workplace arrangement that Verizon approved. Mr. Barber's email states:

Good Afternoon,

Per our conversation Friday, you stated that my WPA was approved. In which it states I take particular medication and

21

therefore was the reason why I asked for a delayed work scheduled and shift moves.

Th[i]s is the reason why I was late this morning, due to me taking medication, in which you stated was unacceptable, because of my notifying you when after the time my shift started, but I had just awaken, due to the muscle relaxer taken I didn't know I would oversleep.

Can you send me the specifics of the WPA so that I will be in proper adherence with it.

(Doc. 67-5, p. 49).

Mr. Dohar responded:

Charles, per our discussion last week, here is what was agreed upon:

- Refrain from lifting, twisting, and excessive bending as well as allowing you to sit periodically when needed.

- Accommodate flexible schedules as long as we are notified in advance of your shift start.

Perhaps if you need to take a muscle relaxer and you have a history of sleeping in then you notify me the night before stating you will be late when you take it.

Let me know if we need to discuss.
Thanks!

(Doc. 67-5, p. 49).

According to Verizon, Mr. Barber continued to call in late, so Verizon changed Mr. Barber's work schedule. (Doc. 67-6, ¶ 16). On May 14, 2015, after a

discussion with Mr. Barber, Mr. Dohar sent an email to Mr. Barber explaining the

schedule change. The email states:

> Charles, per our discussion we will shift your schedule to 11-7:30
> (M,T, every other Wednesday, and Friday) to better accommodate
> your health and well being and to give consistency for our team.
> You will work 10-6 :30 on Thursdays so you can attend the South
> area CCCP call and you will work 10-6:30 every other Wednesday
> so you can attend the national CCCP call. If you have an issue
> meeting that for health reasons, you can notify Marcus and I and we
> will make sure you are covered. You must inform me if there are
> changes to this schedule as soon as you are aware and also must
> notify me when you arrive to work if you are late. All schedule
> changes need to be approved .
>
> Also please work with local operations to schedule at least a
> monthly meeting for the call center partnership and fill out the
> official form that they have provided. If operations pushes back,
> please notify me. All feedback and action items for this
> partnership must be turned in by the deadlines requested.
>
> Thank you!

(Doc. 67-5, p. 50).

On July 9, 2015, Mr. Barber emailed Brent Vader.   (Doc. 67-4, p. 1).  Mr.

Vader was a regional human resources representative for Verizon.  (*See* Doc. 67-4,

p. 2; Doc. 67-6, ¶¶ 1-2).  The email states:

> I'm having to take a lot of time away from the business in the past
> and recently due to an issue that occurred here at work.  I have asked
> Todd Schumacher in the past about it, so that I wouldn't be punished
> for using my time and never got an answer.  I've asked about this
> when it initially happened and I asked about it throughout the past
> couple of years to no avail.  How can this be taken care of, so that I

won't have to continue to exhaust all of my time while trying to rectify the issue and trying to get healthier?

(Doc. 67-4, p. 1).

In his declaration, Mr. Vader stated that before he received Mr. Barber's email, he did not know that Mr. Barber had injured himself at work. (Doc. 67-6, ¶ 7). When Mr. Vader received Mr. Barber's email, Mr. Vader "immediately contacted Mr. Barber by telephone and searched for records related to any report injury." (Doc. 67-6, ¶ 8). Mr. Vader found no record of a workplace injury. Mr. Vader interviewed Mr. Schumacher and determined that Mr. Schumacher "was not made aware of a workplace injury in August 2013." (Doc. 67-6, ¶ 8). Mr. Vader then responded to Mr. Barber's email and stated:

> Thanks for your message and participation on the call this afternoon. I absolutely want to make sure we do everything we can to clarify this situation and help you in any way we can. I am sorry to hear that this has been unresolved for you for quite some time.
>
> Here is the information I have:
>
> - We do not have any records of any claims filed for issues that occurred in the office. I have researched this information with Todd Schumacher and the HR Team that handles all Worker's Compensation Claims. Without any documentation or claims, I am not sure we have many options for an issue that occurred several years in the past.
> - In regards to the time away from the business (in the past and current), the company is extremely flexible and

accommodating to any employee's needs when it comes to taking time away from work to handle personal/medical issues.

- o When an employee files a claim through MetLife to handle these types of issues, MetLife is responsible for working with you and your doctor to approve the time away from the business. Claims that are approved through MetLife are supported by the business.
- o We also do whatever we can to ease the employee's transition back into the business to ensure we provide accommodations and flexibility, based on the guidance of your health care provider. So, I want to make sure you know that you should not feel punished in any way for using your time.
- o But, when MetLife denies a claim for benefits, the employee has the option to appeal. Verizon's policy states that when an employee's claim is denied by MetLife, employees are not permitted to utilize any paid time off. Again, this should not be seen as a punishment of any kind, but a policy the company consistently follows to ensure our STD/FMLA policies are fair/consistent.
  - ▪ Here is more information about the company's policies on Benefits Denial:
    - • https://aboutyou.verizon.com/HRGuidelines/ LifeAndTimeOff/TimeOffAndleaveInformat ion/ShortTermDisability/BenefitsDenial

Again, we want to make sure we do whatever we can to support your health and career growth. Let me know if there is anything else you would like to discuss.

(Doc. 67-4, p. 2).

In the fall of 2015, Verizon's Payroll Department emailed Mr. Barber about two short term disability claims that MetLife had denied, causing Mr. Barber to be overpaid in various pay periods in 2015. (Doc. 67-6, p. 20). The Payroll Department explained that Verizon granted "pending benefits" compensation to Mr. Barber which increased Mr. Barber's net pay during four pay periods. (Doc. 67-6, p. 20). The Payroll Department informed Mr. Barber that he had been overpaid by $4,148.08 because MetLife denied Mr. Barber's short term disability claims. (Doc. 67-6, pp. 17-20). Payroll notified Mr. Barber that it would deduct 20% of his future paychecks until the company had recouped the overpayment. (Doc. 67-6, p. 20).

On December 28, 2015, Mr. Barber forwarded to Mr. Vader emails he (Mr. Barber) had received regarding his investigation of MetLife's denial of short term disability claims. (Doc. 67-6, pp. 17-18). Within an hour, Mr. Vader responded to Mr. Barber's email and explained that the short term disability claims were not related to workers' compensation. Mr. Vader stated:

> As we have discussed previously, there was no workplace injury on record and Worker's Compensation claim filed. We were able to determine this information during discussions with both you and Todd Schumacher earlier this year. Regardless of any Worker's Compensation claim, you had applied for [short term disability] and those claims were denied. The overpayments discussed in the email chain below relate to those STD claims that were not approved by MetLife.

(Doc. 67-6, p. 16).  Mr. Vader reminded Mr. Barber that Verizon had approved FMLA leave for August 13-18, 2015.  Finally, Mr. Vader stated, "I want to make sure we answer any additional questions to address your concerns.  Let me know what your availability looks like tomorrow and I would be happy to review further with you."  (Doc. 67-6, p. 16).

On December 29, 2015, Mr. Barber contacted Mr. Vader regarding a short term disability claim.  Mr. Barber's email reads:

> Todd was supposed to put in a Worker's Compensation claim and I have the info. that he was supposed to enter in. He had a duty to act and if it wasn't done accordingly, then that is against violation. Whereas I shouldn't have to be penalized from the negligence of someone else not doing there [sic] due diligence! I'm still having ongoing back issues and now I'm going to have to pay money back, in which should have been handled accordingly by my Manager at the time.
>
> There should be an alternate means to this outcome, please let me know what other measures can or should be taken going forward. I shouldn't be getting money taken out of my pocket due to another person not reporting an issue to the appropriate channels.

(Doc. 67-6, p. 16).

Mr. Vader responded to Mr. Barber's email later in the day on December 29, 2015.  Mr. Vader stated:

> Thanks for your message. We spent a great deal of time reviewing this scenario, which included an in-depth interview with Todd Schumacher. Todd stated that he was not aware of any workplace injury and stated that you told him that your back injuries were due to an old injury.  Do you have any additional documentation

to support the incident?  We have requested documentation in the past (date, time, location, circumstances, witnesses, care received, etc) and have not received any.  Todd did not have any documentation.  If you are able to provide further details, I would be happy to review it and see if anything can be done at this point.

You filed several claims for STD.  Claims for STD are reviewed by MetLife and require your doctor to authorize your time of the business.  MetLife makes a determination based on the guidance of your doctor on how claims should be paid. It was determined that you were overpaid for claims that MetLife ultimately denied. Unfortunately, the overpayment doesn't have anything to do with the injury itself or whether or not something was reported – it has to do with what MetLife approved based on the claims your doctor submitted.

Verizon offers a great deal of benefits to employees, especially when they need to take time out of the business to focus on health & family situations. Unfortunately, that sometimes means that employees are underpaid or overpaid for those benefits. Verizon wants to make sure we fairly and consistently offer these benefits to employees.

If you disagree with the decision that MetLife has made on your claims, you can feel free to file an appeal and they can review those claims again. Let me know if you'd like to discuss this further and anything else that I can do.

(Doc. 67-6, p. 15).

Later in the evening on December 29, 2015, Mr. Barber emailed Mr.

Vader again and forwarded his December 31, 2014 email to Mr. Schumacher.

(Doc. 78-2, pp. 2-3).  Mr. Barber's email states:

Here's an email of the last time I spoke with Todd in regards to entering a Worker's Compensation claim from me initially hurting my back while lifting the server at work and when I reinjured it removing cables from up under the desk per his instructions.  So

him denying any such thing of our past conversations is a blatant lie and goes [against] Verizon's Code of Conduct.

(Doc. 78-2, p. 2).  Mr. Vader responded to Mr. Barber's email on December 30, 2015.  Mr. Vader's email reads:

Thanks for your message – that email is from December of 2014 and is very general.  Do you have any other specifics about the incident itself?

What else would you like to see done in this situation?  I want to do whatever I can to help.  Based on the information I have, we are not able to determine what happened, when it happened, or what steps were taken.

The Payroll and Finance teams are aware that you will be going off payroll as of 12/31/15 and will be in touch with you regarding the plans to address the past overpayments.  If you have any other questions, please feel free to reach out to me as well.

(Doc. 78-2, p. 2).

As of January 2016, Mr. Barber no longer was employed by Verizon.

(Doc. 67-2, p. 28, tr. p. 371).

## II.    ANALYSIS

### A.    Mr. Barber's ADA Failure to Promote Claim

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees [or] other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In this case, Mr. Barber contends that

Verizon discriminated against him because of his disability when Verizon promoted two other MTS I employees and did not promote Mr. Barber.[2]

Where, as here, a plaintiff relies on circumstantial evidence to establish discriminatory intent, a district court may use the *McDonnell Douglas* analytical framework to evaluate the sufficiency of the plaintiff's evidence. *Flowers v. Troup Cty., Ga. School Dist.*, 803 F.3d 1327, 1335-36 (11th Cir. 2015); *Cusick v. Yellowbook, Inc.*, 607 Fed. Appx. 953 (11th Cir. 2015) (applying Title VII burden-shifting framework to ADA claims).[3] Under this burden-shifting framework, "a

---

[2] In its motion for summary judgment, in addition to addressing Mr. Barber's failure to promote claim, Verizon argues that the company reasonably accommodated Mr. Barber's disability. Having carefully reviewed and liberally construed Mr. Barber's complaint, *see Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003) ("*Pro se* pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed.") (internal quotation marks and citation omitted), the Court finds that Mr. Barber has not asserted an ADA failure to accommodate claim. Under the heading for the ADA count in his amended complaint, Mr. Barber cites the text of the statute that lists the ways in which an employer can violate the ADA. (*See* Doc. 29, pp. 7-8). But the factual allegations in the complaint support a claim that Verizon discriminated against Mr. Barber when Verizon did not promote him in 2014. (*See* Doc. 29, p. 5) ("Plaintiff did not work from May 2014 – August 2014, when he returned to work full time. Plaintiff then inadvertently discovered that personnel that he personally trained had been promoted and was not given justification as to why Plaintiff wasn't. . . ."). Moreover, in his response in opposition to Verizon's motion for summary judgment, Mr. Barber advances no argument concerning an ADA accommodation claim. Rather, he argues that he "was never promoted, even though his job responsibilities were that of a MTSII and higher." (Doc. 77, p. 22). In addition, Mr. Barber contends that Verizon "doesn't have a legitimate reason for denying plaintiff a promotion[.] Plaintiff's job performance was stellar and consistently exceeded Verizon Wireless's IT departmental standards as required per KPI's." (Doc. 77, p. 25). Accordingly, the Court finds that Mr. Barber asserts an ADA failure to promote claim and not an ADA reasonable accommodation claim.

[3] A plaintiff may establish discriminatory intent by using direct, circumstantial, or statistical evidence. "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (citation omitted); *see Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) ("'[O]nly the most blatant remarks,

plaintiff first must make out a prima facie case of discrimination that 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Flowers*, 803 F.3d at 1336 (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). "The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004); *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1275 (11th Cir. 2008) ("More than one formulation of the elements of a prima facie case exist.").

If a plaintiff presents a prima facie case, then the burden shifts to the defendant to articulate a non-discriminatory basis for the employment action at issue. If the defendant carries this light burden, then the burden returns to the plaintiff to prove that the defendant's stated reason for its conduct is pretext for intentional discrimination. *Flowers*, 803 F.3d at 1336.

Though it is one tool for examining evidence of discriminatory intent, "'the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases."

---

whose intent could be nothing other than to discriminate on the [protected classification]' are direct evidence of discrimination.") (citation omitted). Although Mr. Barber submits that he "can prove without a doubt disability discrimination for his claim of failure to [p]romote through direct evidence," (Doc. 82, p. 10), the Court has examined the record and concludes that the record contains no direct evidence of disability discrimination. Mr. Barber has not submitted statistical evidence of discrimination.

*Flowers*, 803 F.3d at 1336 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'"  *Flowers*, 803 F.3d at 1336 (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).  A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that discriminatory intent motivated an employment decision.  *Lockheed-Martin Corp.*, 644 F.3d at 1328.  "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'"  *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).

For purposes of this opinion, the Court assumes without deciding that Mr. Barber can establish a prima facie case of disability discrimination.[4]  Verizon contends that it did not promote Mr. Barber in the summer of 2014 for four reasons:  Mr. Barber exhibited a pattern of tardiness in the year preceding the promotion opportunity; Mr. Barber was involved in unprofessional encounters with other employees in the months before the promotion decision-making process began; as the lead on the IPACD project, Mr. Barber did not ensure that certain

---

[4] Verizon did not address the sufficiency of Mr. Barber's evidence with respect to his prima facie case of disability discrimination, and Verizon appears to have conceded for purposes of summary judgment that Mr. Barber can establish a prima facie case of disability discrimination.  (*See* Doc. 66, pp. 21-27).

equipment was removed from office space; and Mr. Barber did not adequately empty his voicemail box. (Doc. 67-7, ¶¶ 8-9, 12, 14, 17). These are legitimate, non-discriminatory reasons for not promoting Mr. Barber.

Therefore, to survive Verizon's motion for summary judgment, Mr. Barber must show that Verizon's proffered explanations for the employment action are "false, and that discrimination was the real reason for the adverse action." *King v. Ferguson Enters., Inc.*, 568 Fed. Appx. 686, 689 (11th Cir. 2014) (citing *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.,* 446 F.3d 1160, 1163 (11th Cir. 2006)). Mr. Barber can demonstrate that the reasons that Verizon gave for not promoting him were pretext "directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Paschal v. United Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)). Mr. Barber cannot demonstrate pretext by "simply quarrelling with the wisdom" of Verizon's proffered reasons; instead, he must meet each proffered reason "head on and rebut it . . . ." *Alvarez*, 610 F.3d at 1266. Because Verizon has offered more than one legitimate non-discriminatory reason, Mr. Barber "must rebut each of the reasons

to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007).

Mr. Barber argues that Verizon's articulated reasons for not promoting him are pretext for disability discrimination because his "performance ratings were consistently, adequately and proficiently higher than the IT employees Todd Schumacher promoted" (Doc. 77, p. 22) and because his "job performance was stellar and consistently exceeded Verizon Wireless's IT departmental standards" (Doc. 77, p. 25). The record generally supports Mr. Barber's contention that he received positive performance evaluations.

For 2011 through 2014, Mr. Barber's supervisors, including Mr. Schumacher, rated Mr. Barber as "performing" which means that Mr. Barber "sustained performance meeting objectives, requirements and expectations and periodically exceeded them." (Doc. 67-4, pp. 20, 30; Doc. 67-5, p. 10).

In Mr. Barber's 2011 review, Mr. Schumacher stated that "Charles is constantly walking the floor provid[ing] that face to face interaction with his end users which was key to our success." (Doc. 67-4, p. 16). Mr. Barber's 2011 review also contains the following remarks:

- Charles takes ownership in his everyday activities which is shown in his Customer Satisfaction. He embraces change and welcomes new ideas and etc. During the tornados that hit the [Huntsville] area in April, Charles came on site and volunteered his time to pass out water to employees. He also assisted his community during

this crisis. This behavior is a true display of our Core Values here at [Verizon].

- As a member of [End User Support] since 2007 Charles has enhanced his technical knowledge with great strides and has shown that he is ready for the next level. Thanks for a great 2011 Charles and look forward to an even better 2012.

(Doc. 67-4, pp. 18-19).

In Mr. Barber's 2012 review, Mr. Schumacher made the following comments:

- All projects assigned to Charles have been completed on time.

- Charles had a busy 1st ha[lf] of the year. Not only has he support[ed] many projects but he also ensure[d] tickets and csrs w[]ere completed. His customer satisfaction score shows that he was able to balance this work load and succeed. He acted with a sense of urgency when resolving his customer's needs. Charles assisted local Supervisors with setting up their tables during the Supervisor tablet project.

- Charles spends time on the floor to ensure his end users are doing well.

- Charles took ownership of [] projects [assigned to him] and had successful rollouts.

- As a member of [End User Support] Charles continues to prove that he is ready for the next step to TA. Continue this focus and keep find[ing] that higher gear.

- Overall Charles had a great year. As an[] MTS1 he was the lead on many projects for the Huntsville Call Center . . . . I have had the privilege of working with Charles for sometime now and ha[ve] seen his technical aptitude grow leaps and bounds. He is professional in

his everyday interactions with his end users. He also ensured that he maintained a high customer satisfaction with the amount of tickets and CSRs that were assigned to him. Charles also worked with his end users as well as call center management to promote our IT Resource Center to ensure self serve increased.

(Doc. 67-4, pp. 24, 27-29). This review concludes: "Charles has proven and shown that he is ready for the next level MTSII. Thanks for a great year Charles. Looking forward to 2013." (Doc. 67-4, p. 29).

In Mr. Barber's 2013 review, Mr. Schumacher highlighted Mr. Barber's performance in a number of areas. For example, Mr. Schumacher stated:

- [Mr. Barber's] ticket response and customer satisfaction displays that he is truly customer focused.

- Charles was actually the lead on [the IPACD] project. He did a good job with the overall project lead on this. He actually received feedback from the IPACD/UCCE team on how well he managed this project. One key item that I had to follow up with Charles on this project was the removal of all the old Rockwell phones from training rooms. During floor observations we still have Rockwell phones sitting in some cubes. Other than this Charles did a good job overall as lead on this project.

- Huntsville received 1200 new monitors and Charles took the lead on ensuring as fast as they were coming in we could get them installed due to space concerns in our inventory room. This project is still in process but without his quick thinking we would not have had room to store all the monitors in the inventory room.

(Doc. 67-5, pp. 7, 9). Mr. Schumacher also discussed Mr. Barber's difficulty reporting to work on time. Mr. Schumacher wrote: "[o]ne key thing that I would like to touch on is a trend of not being at work ontime [sic] as outlined." (Doc. 67-

5, p. 9).  Mr. Schumacher explained that Mr. Barber's team members "count on hi[m] to assist when needed (which he did a majority of the year) but not being ontime [sic] means that work falls back on them."  (Doc. 67-5, p. 9).  This review concludes:  "From a technical standpoint Charles is ready for the next level to MTSII but would like him to focus on ensuring he is ontime [sic] when scheduled. Thank you for all your hard work and dedication in 2018."  (Doc. 67-5, p. 9).

Mr. Barber's strong technical skills do not diminish or require Verizon to discount performance concerns that Mr. Schumacher expressed to Mr. Barber.  To the extent that Mr. Barber attempts to establish pretext by arguing that his strong performance made him more qualified than the MTS-I employees who Mr. Schumacher recommended for promotion in 2014, Mr. Barber's evidence falls short of the applicable legal standard.

"In the context of a promotion, 'a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted.'"  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotations omitted)).  Rather, "a plaintiff must show that the disparities between the successful applicant's and his own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could

have chosen the candidate selected over the plaintiff." *Springer*, 509 F.3d at 1349 (internal quotations omitted).[5]

In support of his argument that he was more qualified than Mr. Hart and Mr. Sadler, the employees who Mr. Schumacher recommended for promotion in 2014, Mr. Barber points to the results of customer satisfaction surveys. (Doc. 78-4, pp. 2-5). In 2012, Mr. Barber's average score was 5.00 out of 5.00; Mr. Hart's average score was 4.97 out of 5.00; and Mr. Sadler's average score was 4.97 out of 5.00. (Doc. 78-4, p. 2). In 2013, Mr. Barber's average score was 4.98 out of 5.00; Mr. Hart's average score was 4.97 out of 5.00; and Mr. Sadler's score was 4.95 out of 5.00. (Doc. 78-4, p. 3). In 2014 and 2015, Mr. Barber's average score was 5.00, and Mr. Sadler's average score was 4.99. (Doc. 78-4, pp. 4-5).[6] These survey results suggest that based on a limited number of employee surveys, Mr. Barber performed marginally better than Mr. Hart and Mr. Sadler in the area of customer service. But Mr. Barber has not produced evidence documenting Mr. Hart's and Mr. Sadler's performance in other areas. Mr. Barber has not produced annual evaluations for Mr. Hart or Mr. Sadler or other meaningful objective measures of

---

[5] Relative qualifications can come into play when a plaintiff offers other, additional types circumstantial evidence of discriminatory intent. In other words, relative qualifications can be part of a plaintiff's "convincing mosaic of circumstantial evidence." Mr. Barber has not presented other circumstantial evidence to bolster his argument that he was more qualified than the individuals who Mr. Schumacher recommended for promotion.

[6] The record does not contain customer satisfaction survey scores for Mr. Hart for 2014 and 2015.

their performance from which a reasonable juror could conclude that Mr. Barber was more qualified than the employees who received promotions, "let alone so clearly more qualified for the position [than those employees] that a reasonable juror could infer discriminatory intent from the comparison." *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1255 (11th Cir. 2000).

Mr. Barber testified Mr. Schumacher verbally told him about complaints concerning one of the MTS I employees who received a promotion. According to Mr. Barber, this employee took laptops from call center employees "when they didn't want him to." (Doc. 67-2, p. 12). This one general complaint, without additional context, does not establish that Verizon promoted less qualified applicants over Mr. Barber.

Mr. Barber makes no other specific arguments regarding pretext. Neither Mr. Barber's strong technical performance nor other evidence in the record creates "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" that would lead reasonable jurors to conclude that Verizon's stated reasons for its decision not to promote Mr. Barber were pretext masking discriminatory intent. *Paschal*, 573 Fed. Appx. at 825. Mr. Barber offers no evidence to rebut these legitimate non-discriminatory reasons. For example, it is undisputed that on nine occasions between August 2013 and April 2014, Mr. Barber emailed Mr. Schumacher after his (Mr. Barber's) scheduled start time to let Mr. Schumacher

know that he would be late. (Doc. 67-4, pp. 34-42). Mr. Schumacher documented his concern with Mr. Barber's attendance problems in a September 2013 counseling note and in Mr. Barber's 2013 annual review. (Doc. 67-7, p. 15; Doc. 67-5, p. 9). As Mr. Schumacher stated in the 2013 annual review, these attendance issues were Mr. Barber's hurdle to promotion. Accordingly, Mr. Barber has not demonstrated that Verizon's decision not to promote him in 2014 because of his unpredictable attendance is pretext for unlawful discrimination.[7]

Mr. Barber has not presented evidence that demonstrates suspicious timing, ambiguous statements, systematically better treatment of similarly situated employees who are not disabled, or other circumstantial evidence from which a jury could infer that discriminatory intent motivated Verizon's decision not to promote him. Thus, because Mr. Barber cannot rebut Verizon's legitimate, non-discriminatory reasons for passing over Mr. Barber for promotion in 2014, Mr. Barber "has not raised a genuine issue of material fact about whether those reasons were pretext for discrimination." *Crawford*, 482 F.3d at 1309.

---

[7] The Court recognizes that Mr. Barber's attendance issues were related to his back injury. The record does not suggest that Verizon discriminated against Mr. Barber in addressing accommodations that he might require for his injury. Rather, the record demonstrates that Verizon changed Mr. Barber's work schedule to allow him to sleep later when his back was troubling him, and Verizon excused weeks when Mr. Barber was absent in 2015 even though Mr. Barber had exhausted his FMLA leave.

## IV.   CONCLUSION

For the reasons explained above, Mr. Barber has not created a question of fact regarding Verizon's proffered reasons for not promoting him to an MTS II position in 2014.  Accordingly, Verizon is entitled to judgment as a matter of law on Mr. Barber's ADA claim.  Therefore, the Court **GRANTS** Verizon's motion for summary judgment and **DENIES** Mr. Barber's motion with respect to Mr. Barber's ADA claim.

There no longer is an independent basis for subject matter jurisdiction over this action.  Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Mr. Barber's state law claims for intentional infliction of emotional distress and outrage.

Because the Court will not exercise supplemental jurisdiction over his state law claims, the Court **DENIES** as **MOOT** the remainder of Mr. Barber's motion for summary judgment.

The Court will enter a separate final order consistent with this memorandum opinion.

**DONE** this 28th day of September, 2018.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE